Filed 4/17/24; certified for publication 5/13/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| HAROLD MALMQUIST et al., | C099011 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2021-00297646-CU-PO-GDS) |
| v. | |
| CITY OF FOLSOM, | |
| Defendant and Respondent. | |

Plaintiff Harold Malmquist appeals from an order denying class certification in this nuisance action he filed against defendant the City of Folsom (City). He contends reversal is required because the trial court abused its discretion in determining that individual issues predominated over common issues. We disagree and affirm the order.

1

## FACTS AND PROCEEDINGS

We summarize the relevant background and add facts throughout the Discussion section where necessary to resolve the claims raised on appeal.

*The Operative Complaint and Class Certification Motion*

The City treats water from Folsom Lake in its water treatment plant (plant), and distributes potable water to approximately 23,600 homes and businesses. In July 2020, the City began receiving an increased number of complaints from residents that their copper pipes were experiencing "pinhole leaks," which allegedly damaged "persons and properties."

In August and September 2020, respectively, the City hired the consulting firms Black & Veatch (B&V) and HDR Engineering (HDR) to help identify potential contributing factors that might explain the increased complaints. We will discuss the memoranda produced by B&V and HDR in greater detail, *post*.

In March 2021, plaintiff filed this class action against the City. The operative complaint, the second amended complaint (complaint), was filed on December 6, 2021. The complaint alleged that between July 2017 and July 2020, the City had failed to maintain proper corrosion control measures at the plant, instead allowing the pH level of its water to rise to be "consistently above 9, and frequently above 9.2, . . . thereby causing the [City's] water to become corrosive and harmful." The complaint further alleged that the "[a]ggressive, corrosive, and substandard water" supplied by the plant created a nuisance by causing pinhole leaks in copper pipes receiving the water, thereby damaging persons and property.[1] The complaint defined the putative class as "[a]ll individuals and

---

[1] The trial court sustained demurrers without leave to amend as to other causes of action asserted in the complaint, including for negligence, breach of contract, unjust enrichment, and breach of implied warranty. Those claims are not at issue in this appeal.

2

entities who have owned or leased real property in [the City], plumbed with copper piping receiving water from the [City's] [plant] at any time since February 23, 2015."

In March 2023, plaintiff moved for class certification. His memorandum of points and authorities defined the class as he had in the complaint and defined a subclass of "[a]ll class members who have had a pinhole leak manifest in copper piping." Plaintiff sought class certification based on the following theory of liability: "Highly aggressive corrosive water treated and supplied by the City's [plant] created a public nuisance by causing the pinhole leaks damaging its residents' properties that are plumbed with copper piping." He argued in part that common questions predominated over individual ones because "[w]hether the facts surrounding the conduct of the City in operating its [plant] supports a claim for nuisance applies in the same way to all Class members. As each issue central to the City's liability in this case is plainly capable of class-wide resolution, common issues predominate."

Plaintiff asserted that the B&V memorandum concluded the City's water was the probable cause of the leaks throughout the City and recommended instituting a corrosion control measure to mitigate the corrosivity of the City's water and arrest the manifestation of leaks. As to the HDR memorandum, plaintiff asserted that Marcus Yasutake, the City's environmental and water resources director, had emailed HDR and acknowledged that the City knew the pH of its water "had been above 9 for a significant amount of time" and that " 'water with low alkalinity, a pH above 9 and free chlorine, this could be a potential cause of pitting [corrosion].' " HDR responded that " 'extended exposure to pH [greater than or equal to] 9.0, low alkalinity, and free chlorine is known to be more corrosive to copper plumbing.' "

Plaintiff supported his motion with his own declaration, in which he described his experience with the pinhole leaks and the resulting damage, and trial counsel's declaration, which attached numerous exhibits including deposition testimony regarding the City's management of the water distribution system, city permits, water data,

3

inspection reports, operation plans, the B&V and HDR memoranda, and email exchanges related to those memoranda.

The City opposed the motion, arguing that plaintiff failed to carry his burden to establish the requirements for class certification, including the well-defined community of interest requirement. Among other things, the City argued that common questions of law and/or fact did not predominate over individual questions because the existence, cause, and extent of damage to copper piping required individual proof.

In support of its opposition, the City filed a declaration of (director) Yasutake, attaching the B&V and HDR memoranda, a declaration attaching discovery responses, and a declaration of William Broz, principal at ESi, the City's retained expert. The Broz declaration included the results of laboratory tests ESi performed on 12 pipe specimens received from Folsom residents complaining of leaks, which showed that the pinhole leaks in those pipes were caused by poor workmanship rather than water chemistry. Broz's identity and opinion had not been previously disclosed.

Plaintiff objected to the Broz declaration on the grounds that (1) Broz was not a qualified expert because he lacked the background " 'to absorb and evaluate information on the subject matters of water chemistry analysis, statistical analysis, or even metallurgical analysis,' " (2) he did "not have access to reliable sources of information about the subject" because his declaration did not lay sufficient foundation as to the source of the copper pipe specimens, whether those specimens received the City's water, the dates the leaks were discovered, or when the specimens were provided to the City, and (3) the City should have previously disclosed Broz as an expert.

*Trial Court Ruling*

On June 6, 2023, after a hearing, the trial court issued a written order denying plaintiff's motion for class certification. Initially, the court overruled plaintiff's objections to the Broz declaration. It concluded that Broz was a qualified expert because he was "a Licensed Professional Engineer with a Bachelor's of Science in Engineering,

4

with extensive experience including pipe stress analyses," his areas of specialization included "plumbing, domestic water systems, and pipe stress analysis," and his disclosed experience included " 'multidiscipline team investigating accelerated corrosion of copper domestic water pipe,' and an investigation of the 'failure of copper domestic water piping in a multi-family housing development.' "

The trial court also rejected plaintiff's objection that Broz's opinion was not founded on reliable information. It observed that the declaration "established that these samples were provided by City residents raising complaints regarding the very issue raised by Plaintiff's suit, making them particularly probative." The court acknowledged that the origin of four (of the 12) samples was listed as " 'unknown,' " but noted that Yasutake's declaration had explained that they were provided by City residents reporting a pinhole leak. The remaining eight specimens identified the address from where they were harvested, whether the specimen was a hot- or cold-water line, and the orientation of the pipe. The court concluded that the Broz declaration supported the City's argument that pitting and pinhole leaks may be caused by factors other than water composition. Finally, the court concluded the City had no duty to disclose Broz as an expert before filing its opposition.

Proceeding to the substantive issues, the trial court focused on the community of interest requirement and concluded that plaintiff had not shown that common issues predominated. The court observed: " 'A class action cannot be maintained where each member's right to recover depends on facts particular to his case. The rule exists because the community of interest requirement is not satisfied if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class judgment" determining issues common to the purported class.' " (Quoting *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 459.) It added that class treatment for nuisance claims is unusual because such claims are "based on a defendant's activities that inflict individualized property damage upon

5

unique parcels of property," and, therefore, " '[o]nly in an extraordinary situation would a class action be justified where, subsequent to the class judgment, the members would be required to individually prove not only damages but also liability.' " (*City of San Jose*, at p. 463.)

The court noted plaintiff's argument that the City "provided corrosive water, which caused pitting corrosion in copper pipes throughout [the City]," and observed that plaintiff's argument relied almost exclusively on the B&V and HDR memoranda to establish a complete causal connection between the corrosive water and the pitting and leaks experienced by Folsom residents. The court recognized, however, that plaintiff's argument "is at odds with the very reports upon which Plaintiff relies." In support, the court pointed to plaintiff's discussion of the B&V memorandum's conclusions, including that the City's water " '*could* contribute to pitting in copper pipe,' " " '*can potentially* influence corrosive conditions,' " " '*can potentially* contribute to pinhole leaks,' " and " '*could have* created pitting conditions within copper piping based on research with similar water qualities.' " (Italics added.) Similarly, the court recognized that, according to plaintiff, the HDR memorandum concluded that the City's water " '*could* lead to copper pitting in plumbing,' " " '*could* be associated with . . . pitting corrosion,' " and " 'was . . . *likely a contributing factor* to the sudden increase of pinhole leaks throughout the [City's] system.' " (Italics added.)

The court also observed that the B&V and HDR memoranda had recognized other potential causes of corrosion and pinhole leaks in copper pipes. The B&V memorandum noted that " 'the purity of [the City's] water source combined with a pH above 9 and free chlorine for disinfection could contribute to pitting in copper pipe, especially at sites with impurities in the pipe material or at sites where particulate settled. Pipe scale analysis validated this conclusion. Impurities in copper pipes are natural and could be from manufacturing like microscopic burrs, ions other than copper included in the metal, or remnants of cleaning solutions. Storage, transportation, installation, and soldering could

6

all introduce additional impurities, but research studies have shown that while impurities can provide a site to start pitting, their presence is not necessary for pitting to occur in all situations.' " The B&V memorandum further noted that the copper pipe it tested ranged between 81 and 91 percent of the copper pipe wall thickness recommended by the American Society for Testing and Materials, and the HDR memorandum found that copper piping with "thin[ner] wall thicknesses" than recommended " 'could increase the occurrence of corrosion and occurrence of pinhole leaks in piping.' "

Moreover, the court recognized that an evaluation of copper pipe specimens incorporated into the B&V memorandum found that, even if pH had been properly controlled, pitting was still likely to have occurred eventually, although perhaps at a later date and at a "lower frequency of leaks."[2] The court observed: "Despite this language recognizing a potential risk of corrosion and pinhole leaks, Plaintiff assumes and alleges that Plaintiff and the Class have identical claims resulting from Defendant's supply of water. Plaintiff offers no expert witness evidence or analysis of his own to support his position."

The trial court then turned to the Broz declaration, which it found "demonstrates the complexity of the inquiry into whether any given putative class member experienced copper pipe corrosion and pinhole leaks; whether such corrosion or pinhole leaks obstructed the class member's free use of property, so as to interfere with their comfortable enjoyment of life or property; and whether the City's conduct was a substantial factor in causing any harm." In response to the City's request that ESi investigate whether pinhole leaks in copper piping was attributable to a single cause, as plaintiff had pleaded, ESi concluded that reaching reliable conclusions on the causes of pipe failure required examining each individual pipe. Its analysis of 12 pipe specimens

---

[2] The trial court observed that revisions to the original drafts of the B&V and HDR memoranda did not significantly change the language the court relied upon.

7

obtained from the City revealed that " '[i]n all instances, the cause of failure was not corrosive water, but instead was due to poor workmanship during initial installation.' " The ESi report further concluded that water chemistry alleged in the complaint " 'does not correspond to established pitting damage types.' "[3] The court recognized ESi's conclusion that the City's water condition reflected an increased risk of corrosive attack on pipes, but that there are other potential causes of corrosion, including " 'piping orientation, improper installation process . . . , and water temperature.' "

The court rejected plaintiff's assertion that " '[p]roof of the findings and conclusions within the B&V and HDR [memoranda] is common to resolving the issue of City's nuisance liability as to all Class Members.' " It reasoned: "[I]t is not enough merely to assume, as Plaintiff has done, that the City's water condition amounted to a nuisance as to all putative Class members. . . . [¶] Even if Plaintiff is correct that the City provided corrosive water, it does not follow that the water conditions necessarily caused corrosion and/or pinhole leaks in copper piping throughout the City, let alone to the same degree across members of the Class. It also is not clear that each putative class

---

[3] The trial court stated: "The pitting damage documented to date most closely resembles Type II pitting, which is 'visually characterized by relatively small, isolated mounds of corrosion product, with deep, small cross-section volumes underneath where the copper has been consumed during the pitting process.' [Citation.] However, Type II pitting is associated with hot, soft water, and many of the failed pipes reported in Folsom were in cold water service. [Citation.] Plaintiff (through the Black & Veatch and HDR memoranda) also alleges a different failure mechanism, Type III pitting. Type III pitting is associated with soft, cold water service at moderately elevated pH, such as the water provided by Defendant. However, as ESi notes, the 'damage mechanism for Type III . . . is different than those documented to date.' [Citation.] Type III pitting is described in the technical literature 'as having broad areas [of] corrosion deposits, in contrast with the small and isolated deposits typified by Type I and Type II.' [Citation.] Broz attests that '[w]hile the corrosion damage is outwardly similar to that of Type II corrosion (i.e., pseudo-Type II), attributing failures to this mechanism requires a full and detailed understanding of water conditions, as the damage could be caused by factors other than simple water chemistry parameters.' "

member actually received water from the City's [plant] with the same water chemistry given their distance from the [plant] and related change in residual levels. The issue is much more nuanced than that. It may be, for example, some residents of Folsom experienced pinhole leaks because of poor workmanship during the installation of their plumbing systems. Others may have experienced corrosion because of the age of the property and the use of thinner copper piping, which was common at the time. Some may have experienced corrosion because of impurities in their copper pipes or settled particulates. Others still may have experienced no corrosion or pinhole leaks at all."

Because the material submitted by the parties did not demonstrate even a causal connection between the City's water and the leaks, the court observed that proving a *nuisance* claim (as pleaded) would require each putative class member to submit evidence that, among other things, the alleged conduct by the City (in failing to properly oversee its plant's water delivery) substantially interfered with their use and enjoyment of their property. In other words, even if plaintiff could demonstrate "a certain level of offense or interference as to all putative class members, whether such offense or interference rose to the level of a private nuisance cannot be determined on a group basis." Instead, "Numerous and substantial legal and factual questions remain to be resolved, on an individualized basis, about the substantial factor causing harm to the potential class members and their properties. Any harm suffered could potentially be attributable to the water conditions, but also attributable to many concurrently operating factors over which the City has no control, causing different harm." The court concluded that common issues of law and fact on liability did not predominate because, "[e]ven if Plaintiff could prove Defendant provided corrosive water and that water caused damage to copper pipes within the City, there would have to be individual trials as to each class member because a nuisance cause of action requires individual showings. A finding of causation at any degree is not equivalent to causing each class member's damages."

9

The court also concluded that a class action would not be a superior method of adjudicating the proposed nuisance class claims because the individual issues required individual proof. It recognized that some common issues of fact and law existed as to the chemistry of the water provided by the City but concluded that "those common issues do not clearly address or resolve other essential elements of the class's nuisance causes of action." Instead, the root cause of damage to pipes may well be different for each individual putative class member, and therefore determining defendant's liability would require individualized inquiry into each putative class member's circumstances. Defending a class action requiring such an individualized inquiry could prejudice the City.[4]

Plaintiff timely appealed from the trial court's order. The case was fully briefed on January 16, 2024, and was assigned to this panel at the end of that month.

## DISCUSSION

### I

### *Standard of Review*

Code of Civil Procedure section 382 authorizes a class action "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." Our Supreme Court has described the proper standard of review from an order on a class certification motion as follows: "We review the trial court's ruling for abuse of discretion and generally will not disturb it ' "unless (1) it is unsupported by substantial evidence, (2) it

---

[4] Additionally, the trial court noted that class treatment could raise due process concerns for absent class members because each class member's fate would be tied to the class judgment, and an opt-out mechanism would not alleviate those concerns because each class member would not be able to determine whether to opt out without retaining an expert to assess the extent of any damage to their plumbing. The court also recognized that there would be other possible avenues of relief, including a mass tort action, which plaintiff's counsel had stated he planned to pursue.

rests on improper criteria, or (3) it rests on erroneous legal assumptions." ' [Citation.] We review the trial court's actual reasons for granting or denying certification; if they are erroneous, we must reverse, whether or not other reasons not relied upon might have supported the ruling." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530.)[5] Under the substantial evidence standard, we "must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1022 (*Brinker*).) An inference is reasonable if it is a product of logic and reason and rests on the evidence. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633.) One valid reason for denying certification is sufficient. (See *Brinker*, at p. 1022; *Sav-On Drugs Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326-327 (*Sav-On*); *Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133, 143.)

As for class certification, our high court has "articulated clear requirements for the certification of a class. The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' " (*Brinker*, *supra*, 53 Cal.4th at p. 1021.)

Predominance is the primary class certification requirement at issue in this case. The ultimate question in determining whether the predominance requirement has been

---

[5] This standard of review "presents an exception to the general rule that a reviewing court will look to the trial court's result, not its rationale." (4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 314(3), p. 432.)

met is whether " 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible." (*Brinker*, *supra*, 53 Cal.4th at pp. 1021-1022; see *Ayala v. Antelope Valley Newspapers, Inc.*, *supra*, 59 Cal.4th at p. 530 [the question at the class certification stage is "whether the operative legal principles, as applied to the facts of the case, render the claims susceptible to resolution on a common basis"].) "[T]he focus in a certification dispute is on what type of questions—common or individual—are likely to arise in the action." (*Sav-On*, *supra*, 34 Cal.4th at p. 327.)

" 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) However, "class treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class judgment" ' on common issues." (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 28.) " 'Only in an extraordinary situation would a class action be justified where, subsequent to the class judgment, the members would be required to individually prove not only damages but also liability.' " (*Id.* at p. 30.)

"The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' " (*Sav-On*, *supra*, 34 Cal.4th at p. 326.) But this does not mean the trial court always must ignore the merits of the case: "A class certification motion is not a license for a free-floating inquiry into the validity of

12

the complaint's allegations; rather, resolution of disputes over the merits of a case generally must be postponed until after class certification has been decided [citation], with the court assuming for purposes of the certification motion that any claims have merit [citation]. [¶] We have recognized, however, that 'issues affecting the merits of a case may be enmeshed with class action requirements . . . .' [Citations.] When evidence or legal issues germane to the certification question bear as well on aspects of the merits, a court may properly evaluate them. [Citations.] The rule is that a court may 'consider[] how various claims and defenses relate and may affect the course of the litigation' even though such 'considerations . . . may overlap the case's merits.' [Citations]. [¶] In particular, whether common or individual questions predominate will often depend upon resolution of issues closely tied to the merits." (*Brinker*, *supra*, 53 Cal.4th at pp. 1023-1024.) That is because a court must determine "whether the elements necessary to establish liability are susceptible of common proof." (*Id*. at p. 1024.) "[W]hether an element may be established collectively or only individually, plaintiff by plaintiff, can turn on the precise nature of the element and require resolution of disputed legal or factual issues affecting the merits." (*Ibid.*) Stated another way, "a trial court must examine the plaintiff's theory of recovery, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common issues predominate. To the extent the propriety of certification depends upon disputed threshold legal or factual questions, a court may, and indeed must, resolve them." (*Id*. at p. 1025.)

## II

### *Challenge to Order Denying Class Certification*

Plaintiff challenges the trial court's determination that class certification was not appropriate because individual issues predominated over common issues. He contends common issues predominate because the issues of fact and law necessary to determine the City's nuisance liability are common to all class members. Specifically, he argues he can establish the City's class-wide nuisance liability through the B&V and HDR

13

memoranda's conclusions that the City distributed corrosive water to all putative class members, and that the City's liability applies the same way to all putative class members because they were all exposed to the City's water for an extended period of time. Plaintiff also contends the trial court erred in overruling his objections to the Broz declaration. We disagree with both contentions.

A. *Broz Declaration*

We begin with plaintiff's claim that the trial court erred when it overruled his objections to the Broz declaration on the bases that Broz was an unqualified expert and did not have access to reliable sources of information. At the outset, we review the trial court's ruling for an abuse of discretion. (See *Diamond v. Reshko* (2015) 239 Cal.App.4th 828, 841-842.) The abuse of discretion standard asks "whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered." (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598.) Plaintiff raises multiple arguments, which we will address in turn.

First, plaintiff restates the argument he made in the trial court that Broz was unqualified to testify as an expert. He contends, as he did in the trial court, that Broz is disclosed as a mechanical engineer, and therefore "does not have the background to absorb and evaluate information on the subject matters of water chemistry analysis, statistical analysis or even metallurgical analysis" and "does not have the capacity to determine legal issues of the elements of class certification and causation."

The trial court rejected this argument. It set forth the applicable standard for admitting expert testimony as stated in Evidence Code Section 720: "(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert. [¶] (b) A witness' special knowledge, skill, experience, training, or education may be shown

14

by any otherwise admissible evidence, including his own testimony." The court also recognized that "[a]n expert's qualifications can be established in any number of different ways, including 'a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion.' " (Quoting *ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 294.)

Applying these criteria, the court concluded that Broz's declaration adequately set forth his special knowledge, experience, and education. It noted that the declaration described him "as a Licensed Professional Engineer with a Bachelor's of Science in Engineering, with extensive experience including pipe stress analyses," identified his areas of specialization as including "plumbing, domestic water systems, and pipe stress analysis," and stated that his experience included " 'multidiscipline team investigating accelerated corrosion of copper domestic water pipe,' and an investigation of the 'failure of copper domestic water piping in a multi-family housing development.' " Plaintiff does not address these findings or conclusions or explain how the court applied improper criteria to its decision. Instead, plaintiff's argument amounts to mere disagreement with the court's exercise of its discretion, and accordingly his argument lacks merit.

Second, plaintiff restates the argument he made in the trial court that Broz did not have access to reliable sources of information. We set forth the trial court's justification for rejecting that argument *ante*. Because plaintiff does not present any argument as to why the trial court's reasoning constituted an abuse of discretion, this argument, too, lacks merit.

Third, plaintiff points to four instances in which Broz allegedly testified beyond his area of expertise as a mechanical engineer. He points to Broz's testimony about " 'water characteristics,' " "what is required 'to reach reliable conclusions on causation,' " "the scope and scale of the HDR and B&V studies resulting in findings that the water's corrosive water was the root cause of the widespread pinhole leaks," and

15

HDR's and B&V's findings that the City's water caused the pinhole leaks. Plaintiff also claims Broz testified outside of his expertise by testifying about specimens being from "Unknown" sources.

The trial court addressed and rejected these arguments as well. It determined that Broz's area of expertise was broader than merely his expertise as a mechanical engineer, that his expertise included "plumbing, domestic water systems, and pipe stress analysis," and that his disclosed experience included " 'multidiscipline team investigating accelerated corrosion of copper domestic water pipe,' and an investigation of the 'failure of copper domestic water piping in a multi-family housing development.' " Plaintiff does not challenge these findings or argue that Broz's testimony exceeded his areas of expertise as defined by the court. In the absence of a cogent argument that the trial court abused its discretion, plaintiff's contention fails.

B. *Predominance*

As he did in the trial court, plaintiff argues that class treatment was appropriate because the issues of fact and law necessary to determine the City's nuisance liability are common to all putative class members.

To prove a cause of action for public nuisance, plaintiff must prove that: (1) the City, by acting or failing to act, created a condition or permitted a condition to exist that was an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) the condition affected a substantial number of people at the same time; (3) an ordinary person would be reasonably annoyed or disturbed by the condition; (4) the seriousness of the harm outweighs the social utility of the City's conduct; (5) plaintiff or the class member did not consent to the City's conduct; (6) plaintiff or the class member suffered harm that was different from the type of harm suffered by the general public; and (7) the City's conduct was a substantial factor in causing plaintiff's or the class member's harm. (See Judicial Council Cal. Civ. Jury Instns. (2019) CACI No. 2020.)

16

The elements of a private nuisance are the same except there is no requirement that plaintiff prove a substantial number of people were harmed and the plaintiff suffered harm that was different from that suffered by the general public, but there are additional elements that the plaintiffs owned, leased, occupied, or controlled real property, that the City's water interfered with plaintiffs' use of their property, and that plaintiffs were harmed thereby.  (See Judicial Council Cal. Civ. Jury Instns. (2019) CACI No. 2021.)

Plaintiff argues that the trial court ignored the conclusions of the B&V and HDR memoranda and instead "blindly accepted" the Broz declaration.  As he did in the trial court, plaintiff contends the B&V and HDR memoranda amounted to party admissions establishing class-wide nuisance liability because they "provide[] direct evidence that the City's water was corrosive and that the City's corrosive water was a substantial factor in corroding the copper pipes of Class members causing the pinhole leaks."  In support, plaintiff presents multiple quotations from the B&V and HDR memoranda that he contends demonstrate that the City's water was a substantial factor in causing the reported leaks.  As one example, he points to the B&V memorandum where it opines: "the purity of the City's water source combined with a high pH level and free chlorine for disinfection *could contribute* to pitting in copper pipe," "[o]ver a five-year span the hourly pH ranged from a low of 6 to a high of 10, and a pH above 9 *can potentially* influence corrosive conditions," "[u]nfortunately, the increase in pH over the last few years, along with impurities in the pipe materials or settled particulate, *can potentially* contribute to pinhole leaks," and "[t]he results of scale analysis indicate that pH increases (over the last few years), low alkalinity pure water treated with free chlorine *could contribute* to pitting."  (Italics added.)

The trial court acknowledged plaintiff's argument, but it found that the memoranda did not establish a complete causal connection as plaintiff asserted.  Indeed, the court quoted many of the same passages plaintiff quotes in his briefing on appeal and determined that the B&V and HDR memoranda established only that the City's water

17

*could have* caused corrosion and leaks, while also acknowledging other potential causes for corrosion and pinhole leaks. The court further noted that an evaluation incorporated into the B&V memorandum had found that pitting in copper pipes was likely to occur eventually even if the City's water was not corrosive. Contrary to plaintiff's argument that the trial court ignored the conclusions of the B&V and HDR memoranda, the court's decision demonstrates that it carefully considered the memoranda's conclusions and the limits thereof.

Plaintiff similarly fails to establish that the trial court "blindly accepted" the Broz declaration. The court was authorized to " 'consider[] how various claims and defenses relate and may affect the course of the litigation[,]' even though such 'considerations . . . may overlap the case's merits[,]' " to determine "whether the elements necessary to establish liability are susceptible of common proof." (*Brinker*, *supra*, 53 Cal.4th at p. 1024.) The court's order demonstrates that it carefully considered all the evidence together and determined that individual issues predominated over class issues. The court concluded that, even if plaintiff could demonstrate "a certain level of offense or interference as to all putative class members, whether such offense or interference *rose to the level of a private nuisance cannot be determined on a group basis*" because each putative class member would be required to individually demonstrate that the City's conduct was a substantial factor in causing that class member's harm. (Italics added.) Because " 'every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class judgment" ' on common issues," class treatment was not appropriate. (*Duran v. U.S. Bank National Assn.*, *supra*, 59 Cal.4th at p. 28.)

For similar reasons, we reject plaintiff's argument that the trial court applied improper criteria by imposing an excessively high burden of proof. Plaintiff argues that he was not required to prove the merits of his case at the class certification stage, but rather only that the City's class-wide liability would be established if he prevailed on his

18

theory that the City's water was a substantial factor in causing the leaks. But the court was not required to simply accept plaintiff's assertion that he could prove the City's water had corroded all copper pipes receiving the water. Instead, and as we have discussed, the court was authorized to " 'consider[] how various claims and defenses relate and may affect the course of the litigation.' " (*Brinker*, *supra*, 53 Cal.4th at p. 1024.) That is what the court did, and it concluded that establishing the City's nuisance liability would require resolving "[n]umerous and substantial legal and factual questions" on an individualized basis.

Next, plaintiff contends the trial court abused its discretion in determining that individual issues predominated on the basis that, even if some leaks were caused or accelerated by something other than the City's corrosive water, class treatment was still appropriate because those individual issues would be issues of damages, not liability. (See *Brinker*, *supra*, 53 Cal.4th at p. 1022 [class will be certified if defendant's liability can be determined by facts common to all members of the class, even if members must individually prove damages]; *Sav-On*, *supra*, 34 Cal.4th at p. 333 [class action not inappropriate simply because each class member may be required to make individual showing as to eligibility for recovery or as to the amount of damages].) In doing so, he compares these putative class members to unusually susceptible victims of tortfeasors, in which instance the tortfeasor is required to "take the person he injures as he finds him." (*Rideau v. Los Angeles Transit Lines* (1954) 124 Cal.App.2d 466, 471.) Similarly, he points to *Department of Fish & Game v. Superior Court* (2011) 197 Cal.App.4th 1323, in which the court stated: "Class treatment is not barred where a single wrongful act has different effects on different claimants such that some may have claims while others may not. ' "In such cases, the Courts will generally certify a class if the defendant's action can be found to be wrong in the abstract even if no individual person has been damaged. [Citations.] These situations are distinguishable from situations where the Court cannot

19

determine the wrongfulness of an action without reference to individuals." ' " (*Id.* at p. 1356.)

We find plaintiff's comparisons to be inapt. The trial court's decision was not based on the conclusion that each putative class member would be required to prove their *damages*, or their inclusion in the class following a determination of the City's class-wide liability, as plaintiff suggests. Instead, the court's decision was based on its determination that, at the conclusion of class proceedings, there would still remain numerous and substantive questions about the City's *nuisance liability* as it related to each class member. The court observed that "[e]ven if the water conditions made those properties with poor workmanship or other issues more susceptible to corrosion and pinhole leaks, individual trials would still be required to determine the full scope of *liability* (i.e., whether the City's provision of water with those conditions was a substantial factor in causing Plaintiff['s] and Class members' harm) *and damages*." (Italics added.) So framed, this case is not like one in which a tortfeasor has injured an unusually susceptible plaintiff, and it is not a case in which the City's conduct can generally be described as a wrong in the abstract without consideration of individual circumstances.

Finally, we note plaintiff's argument that the trial court incorrectly stated: "Plaintiff offers no expert witness evidence or analysis of his own to support his position." The court's statement was made in reference to an evaluation incorporated into the B&V memorandum that recognized pitting would eventually have occurred even had the chemical composition of the City's water been properly controlled. The court noted that "[d]espite this language recognizing a potential risk of corrosion and pinhole leaks, Plaintiff assumes and alleges that Plaintiff and the Class have identical claims resulting from Defendant's supply of water," and recognized that plaintiff did not offer expert witness evidence or analysis to support his position. Plaintiff does not point to any expert witness evidence or analysis that the court overlooked. Indeed, plaintiff relied

20

almost exclusively on the memoranda produced by B&V and HDR, contractors retained by the City.

We recognize that plaintiff disagrees with the trial court's exercise of its discretion. However, he has failed to demonstrate that the court's decision is unsupported by substantial evidence or that it rests on improper criteria or erroneous legal assumptions. Because plaintiff has not shown that the trial court abused its discretion when it denied his motion for class certification, we affirm the order.[6]

## DISPOSITION

The order denying class certification is affirmed. Respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


_____/s/_____
Duarte, Acting P. J.


We concur:



_____/s/_____
Renner, J.



_____/s/_____
Boulware Eurie, J.

---

[6] Based on our conclusions, we need not and do not address the trial court's other bases for denying the motion for class certification. To the extent plaintiff raises other arguments for the first time in his reply brief, those arguments are forfeited. (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 158 [" 'We will not ordinarily consider issues raised for the first time in a reply brief' "].)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| HAROLD MALMQUIST et al., | C099011 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2021-00297646-CU-PO-GDS) |
| v. | |
| CITY OF FOLSOM, | |
| Defendant and Respondent. | |

THE COURT:

The opinion in the above-entitled matter filed on April 17, 2024, was not certified for publication in the Official Reports. For good cause it now appears the opinion should be published in the Official Reports, and it is so ordered.


_____/s/_____
Duarte, Acting P. J.


_____/s/_____
Renner, J.


_____/s/_____
Boulware Eurie, J.

EDITORIAL LISTING


APPEAL from a judgment of the Superior Court of Sacramento County, Lauri A. Damrell, Judge.  Affirmed.

Stonebarger Law and Gene J. Stonebarger for Plaintiffs and Appellants.

Best Best & Krieger, Jeffrey V. Dunn, Christopher M. Pisano, Patricia Ursea, and Kara L. Coronado for Defendant and Respondent.